CHICAGO, ROCK ISLAND & PACIFIC RAILWAY COMPANY *v.* SMITH.

Opinion delivered April 7, 1913.

1. MASTER AND SERVANT—INJURY TO SERVANT—DUTY OF MASTER TO FURNISH SAFE TOOLS—ASSUMED RISK.—Where plaintiff is a car repairer and is injured by a defective hammer furnished by defendant while in the discharge of his duties, the plaintiff does not assume the risk of any dangers from the use of said hammer, which arose from the negligence of the defendant, unless he was aware of the negligence of the defendant in providing the hammer then being used, and appreciated the dangers arising therefrom, and the servant is not bound to search for dangers except those risks that are patent to ordinary observation. (Page 521.)

2. MASTER AND SERVANT—NEGLIGENCE—DUTY TO FURNISH SAFE TOOLS.—Where defendant furnishes plaintiff with tools with which to perform the duties of his employment, the plaintiff has the right to rely upon the assumption that the defendant has performed the duty devolving upon it not to expose him to an extraordinary danger. (Page 523.)

3. MASTER AND SERVANT—ASSUMPTION OF RISK—QUESTION FOR JURY.—Where plaintiff was employed to assist a car repairer and was injured by being struck by a hammer used by the car repairer, and the evidence shows that the hammer had a defective striking face, it is a question for the jury whether the plaintiff assumed the risk of the defective condition of the hammer. (Page 524.)

4. MASTER AND SERVANT—INJURY TO SERVANT—QUESTION FOR JURY.— When plaintiff is injured by being struck by a hammer used by a car repairer whom he was helping, it is a question for the jury under all the facts and circumstances adduced in evidence whether an unskilled laborer of ordinary intelligence should have known that the hammer was defective and should have known and appreciated the dangers that he was exposed to by reason thereof. (Page 524.)

5. DAMAGES—PERSONAL INJURY—NOT EXCESSIVE WHEN.—Where plaintiff is injured by the negligence of defendant in furnishing him defective tools with which to work, a verdict of $10,000 damages will not be declared excessive, when plaintiff has for eleven months been confined to his bed, suffered great pain, required the attendance of a physician, and will probably be required to have his leg amputated. (Page 526.)

6. REMOVAL OF CAUSES—WHAT MAY BE CONSIDERED.—In determining whether a cause should be removed to the Federal Court, the State court may look to the allegations of the complaint, when not in conflict with the statements of the petition for removal. (Page 527.)

7. REMOVAL OF CAUSES—WHEN DENIED.—A suit brought in a State court outside of the Federal district in which the plaintiff resides is not removable on the ground of diversity of citizenship on petition of the defendant who is a citizen and resident of another State. *St. Louis & S. F. Rd. Co. v. Kitchen,* 98 Ark. 507. (Page 528.)

Appeal from Dallas Circuit Court; *H. W. Wells,* Judge; affirmed.

### STATEMENT BY THE COURT.

Harvey Smith was injured while in the service of the Chicago, Rock Island & Pacific Railway Company by being struck on the shin by an eight-pound sledge hammer in the hands of a car repairer whom he was assisting in the work of repairing a defective car. The hammer as alleged in the complaint had an imperfect striking surface and was defective for the use to which it was being put at the time the injury was received. Smith brought this suit against the railway company to recover damages for the injury.

The testimony adduced on behalf of the plaintiff is substantially as follows:

J. J. Dozier testified: I am a car repairer and at the time the plaintiff Smith received the injury com-

plained of and for some time prior thereto was engaged in the service of the defendant railway company at El Dorado, Arkansas. The injury was received by the plaintiff at El Dorado on the 10th day of July, 1911. Some time before that the shed and tool house of the defendant at El Dorado was burned and the handle was burned out of the hammer in question. A new handle was placed in it. The striking face of the hammer was imperfect. It is not straight but is drawn sideways. When hammers are in this condition they do not strike true. I showed this hammer to the foreman before the accident, and he told me that he would get some new hammers in a short time. The hammer in question is an eight-pound hammer and the handle is about twenty-four inches long. At the time the plaintiff was injured there was a scarcity of hammers of this kind in the repair yard, and it was a common custom for me to loan my hammer to another workman in the yard. This was done by direction of the foreman. On the day plaintiff was injured I left the hammer in question with some other tools between the rails on track No. 3 in the yards at El Dorado. It was the only hammer there with the tools. If a turnbuckle in a freight car is so tight that you can not prize it loose, the men sometimes resort to a hammer like this to jar it loose. In those cases, we take a lever, a pinch bar or line bar or something of that sort or a piece of wood small enough, and one man prizes it and the other man goes on the opposite side and strikes, following the turn with a hammer or maul and that moves the buckle in that direction. The emergency which makes that necessity is that the threads get rusty in the buckle or are not in a straight line, which makes the buckle hard to turn. By striking the top side that breaks the rust on the rod. The two men, the one prizing down and the other striking, would be facing each other under the car. The man striking with the hammer, strikes in the direction of the man with the prize.

R. S. Blackman testified: I was a car repairer in the service of the defendant railway company at the time

the plaintiff was injured.  At the time he was hurt we were working on a car engaged in taking the slack out where it had gone down.  We had jacked up the car and were under it trying to turn the turnbuckle so as to tighten up the truss rods.  There were four turnbuckles under this car and we had adjusted two of them before the plaintiff was hurt.  The truss rods are of iron and are an inch or an inch and three-quarters in diameter and extend from each end under the center.  The turnbuckles are in the middle and are put there for the purpose of tightening the truss rods and keeping them properly aligned.  There are screws upon each end of the turnbuckle and you tighten or loosen them according to the way you turn it.  I had taken a small hammer and mauled the turnbuckle as heavy as I could pound it but could not loosen it.  I did not have a sledge hammer. The foreman had told me that some would be in in a few days, and in the meantime directed me to borrow one from the nearest workman when I needed one.  I directed the plaintiff, my helper, to go and get me a sledge hammer.  He went out about two car lengths ahead and got the hammer in question and brought it under the car where we were working.  He pitched the hammer over to me and I caught it.  I directed him to take a piece of timber and put it in the turnbuckle and prize towards himself.  I took the hammer and commenced pounding on the turnbuckle.  I was striking towards the plaintiff.  After I had struck three or four licks, the hammer glanced and struck plaintiff on the lower limb between the knee and the ankle.  The plaintiff was in a squatted position and fell back.  I asked him if he was hurt and he said yes.  The hammer did not leave my hand when it struck him but struck him pretty hard; we were doing the work in the usual manner and I was just as careful as I could be in striking the turnbuckle.  I think the slipping of the hammer was caused by the defective condition of its striking face.  I examined the hammer after the plaintiff was struck and saw that the face of it was all knocked down and that

.its striking surface was defective. I did not notice this until after the accident occurred.

Harvey Smith, the plaintiff, testified: I am twenty-eight years of age and my residence is at El Dorado, Arkansas. I have lived there four years. I had been working for the defendant company a little more than one year before I was injured. This was the first railroad work I had ever done. I worked as fireman on the road some and in the car repair department some. I was helper to a car repairer. Prior to the injury I had been strong and well and had not been sick to amount to anything for ten years. I have no means of support except manual labor. I have not been able to earn anything since I received this injury and have been in bed most of the time. (The trial was had about eleven months after the injury was received.) I suffered great pain after I received the injury. I remained in the hospital three weeks and then by the permission of the physician came home. I stayed at home a month or probably six weeks and then went back to the hospital and remained there about three weeks. The railroad surgeon split my leg and went on the inside of the bone. About two weeks after I was hurt my leg swelled up and became inflamed. Doctor Wharton opened up my leg twice. The first time I did not take any chloroform. The incision was about an inch and three-quarters or two inches long. When I went back to the hospital the second time they operated on my leg on the left side of the bone. They gave me chloroform. My leg pains me nearly all the time. My knee is swelled up, and, while the swelling has gone down some, it pains me to walk on my leg and walking makes it swell.

The plaintiff detailed the manner in which he received his injury practically the same as the witness Blackman. He said they had been instructed to hurry up the job at which they were working when he was injured.

Dr. R. A. Hilton testified: I am a physician and surgeon. I was called to see the plaintiff about the first

of November, 1911, and have been treating his leg ever
since that time.   When I first saw him his temperature
was over one hundred and five.   His leg was very much
swollen and in an inflamed condition; there was an in-
cision in the leg which had been made by the railroad
surgeon.   I opened the leg thoroughly and went under
the muscles with my finger.   There were sacks of pus
all through there and under the muscles.   I broke them
down with my finger.   I took a scrape and raked out all
the dead bone.   There was some pus in the bone.   The
plaintiff was delirious for a great part of the time at first
and I thought it would be necessary to amputate his limb
at once.   After forty-eight hours he got better and later
on got up so he could walk around.   The periosteum is
the covering of the bone and assists in nutrition.   The
periosteum of the large bone in plaintiff's leg is very
much involved and I believe that the small bone is, too,
on account of the fact that there has been so much sup-
puration of the parts around them.   I can't understand
how it would be possible for it to be otherwise when you
consider the condition of the parts around and about it.
The witness was asked, ''From your knowledge of this
wound and in the treatment of it, what do you think with
reference to the involvement of the knee?'' and an-
swered, ''I think it is very likely that it is involved; it is
to the extent that to allow it to go on, is to take chances
of losing the limb.''

        We quote from the testimony of the witness as
follows:

        Q.   From your treatment of this wound, and your
observation of it, Doctor Hilton, I will ask you to state
what are the probabilities of a cure of his leg, if any, and
in what time?

        A.   Doctor Runyan had a shot at it and didn't cure
it, and so did Doctor Wharton and never and I didn't
cure it.   Taking it for granted that the bone is involved,
it would take about ninety days, and he would have a
crippled leg forever, and it would be about the same in
the event of amputation.

Q. What do you think are the chances of amputation of this leg in the condition it is now?

A. I would be governed largely by the condition after looking into the bone. I believe there is some involvement of the joint, and, if I found that, I would amputate it.

I think that five hundred dollars would be a reasonable fee for the services I have already performed and there is absolutely necessity for further treatment. I think the cost of medicine can not be less than one hundred dollars.

Doctor Wharton testified that the condition of the plaintiff is bad. That the involvement to the bone, if it is extensive enough through and through, would be sufficient to cause him to lose his leg. That the dead bone would have to be taken out, and, if you did not get it all the first time, you would have to operate again. On cross examination he stated that he believed there is an opportunity for the leg to be restored by an operation to the bone tissue. He said, in his opinion, there is an opportunity for the plaintiff's leg to get well.

Dr. W. H. Simmons testified: I made an examination of the plaintiff's leg at the request of the claim department of the railway company on June 5, 1912. The plaintiff was under the influence of morphine when I examined him. I found no broken bone or dead bone, but found decayed bone. I can not say about his chances of complete recovery. That depends entirely upon the treatment and exact condition of the leg, and you can not tell about that condition until you get to the bone. If the dead bone is removed, if there is any there, he has a chance to recover, but, if the bone is entirely involved, it means amputation. I did not examine the bone except through the skin. I discovered nothing which led me to believe that the bone was entirely involved.

The jury returned a verdict in favor of the plaintiff for ten thousand dollars, and from the judgment rendered the defendant has duly prosecuted an appeal to this court.

*Thos. S. Buzbee* and *Geo. B. Pugh,* for appellant.

1. Where the instrument used by the servant is simple, and the defect therein is so open and patent as to be observable at a casual glance, he is negligent if he makes use of it blindly and without taking the slight precaution necessary for his own protection, and, if injured, such negligence prevents recovery. The servant, it is true, assumes no abnormal risks of which he had actual or constructive knowledge, but, under the circumstances of this case, it was his duty to observe and know the condition of the hammer because its defects were open and patent. 1 Labatt, Master & Servant, 1138; *Id.* 1159, § 413; 47 N. Y. Supp. 285; 58 Ill. App. 117; 9 Col. 159, 165; 11 Pac. 50; 134 Ind. 156; 33 N. E. 355; 118 N. C. 59; 23 S. E. 925; 11 Ind. App. 110; 38 N. E. 547; 79 Tex. 104; 14 S. W. 918; 178 Mass. 242; 15 Ind. App. 353, 356; 43 N. E. 273; 44 N. E. 59; 151 Ill. 472; 38 N. E. 241; 76 Wis. 136-143; 44 N. W. 752; 69 N. W. 352; 51 N. W. 350; 53 Ark. 117; 95 Ark. 291; 141 S. W. (Ark.) 1176; 145 S. W. (Ark.) 879.

2. If appellee could have discovered, by the use of ordinary care on his part, the condition the hammer was in, and that it would be dangerous to use it, he assumed the risk of being injured by such condition. The court therefore erred in refusing to modify instruction 2, as requested by appellant. 151 S. W. 1005; 141 S. W. (Ark.) 1176, 1178, 1179.

3. Appellant's petition for removal from the State court into the Federal court should have been granted. 93 Fed. 728.

4. Under the evidence in this case, the verdict is grossly excessive. 89 Ark. 522.

*Powell & Taylor* and *Patrick McNally,* for appellee.

1. The servant assumes the ordinary risks incident to his employment; but he assumes no risk resulting from the negligence of the master unless he is aware of such negligence and understands and appreciates the danger. That he could by the exercise of ordinary care

have discovered and avoided the danger does not constitute an assumption of risk, where it arose by reason of the negligence of the master. 77 Ark. 367, 374; *Id.* 458; 89 Ark. 424; 92 Ark. 102; 95 Ark. 291; 87 Ark. 396; 101 Ark. 197.

In this case, if appellee was bound to take notice of the defective condition of the hammer, which is not conceded, he is nevertheless relieved from assumption of the risk by the master's promise to furnish new and suitable hammers, which, as he testifies, he thought had been supplied. 86 Ark. 335; *Id.* 516; 88 Ark. 28; 90 Ark. 555; 97 Ark. 553.

2. Appellant's contention that appellee was guilty of contributory negligence because the defect in the hammer was discoverable by an examination or inspection of it, is not tenable. He was not guilty of contributory negligence simply because its defective condition was discoverable by an examination, because on him rested no duty of inspection, and he had the right to rely both on the performance by the master of his duty to exercise ordinary care to furnish safe tools and appliances, and the promise to furnish new hammers. *Supra;* 101 Ark. 197.

3. The petition for removal to the Federal court was properly overruled. 98 Ark. 507; 195 Fed. 832; 199 Fed. 667; *Id.* 291.

4. The verdict is not excessive, when considered in the light of appellee's age, his life expectancy, his earning capacity, his expenses for treatment and his long continued suffering, with the reasonably certain prospect of final loss of the limb. Ramsey's condition, 89 Ark. 522, cited by appellant, was far preferable to appellee's and that case affords no just basis on which to ground a contention for reduction of the judgment. 105 Ark. 533.

HART, J., (after stating the facts). The court gave the following instruction at the request of the plaintiff, which was objected to by the defendant.

"No. 2. You are instructed that at the time of re-

ceiving the injury complained of, the defendant railway company owed to the plaintiff the duty of using ordinary care and diligence in providing for the safety of the plaintiff and his foreman a suitable and safe hammer for the purpose of doing the work in which they were engaged. The plaintiff while doing the work in which he was engaged did not assume the risk of any dangers from the use of said hammer, if furnished by the defendant to the plaintiff for his use in the work in which he was engaged, which arose from the negligence of the defendant unless he was aware of the negligence of the defendant in providing the hammer then being used and appreciated the dangers arising therefrom. If the plaintiff had no knowledge of the defective condition of the hammer, then he had a right to rely upon the assumption that the defendant had performed the duty devolving upon it so as not to expose him to extraordinary danger."

The court also gave the following instruction, among others, at the request of the defendant:

"No. 7. The plaintiff is presumed to know of such defects in the hammer as were plainly to be seen by ordinary observation, and you are instructed that if the injury to plaintiff was caused by a defect in the hammer which could have been discovered by ordinary observation, he can not recover in this case."

It will be observed that in instruction No. 2, given at the request of the plaintiff, the court told the jury that the plaintiff "did not assume the risk of any danger from the use of said hammer which arose from the negligence of the defendant unless he was aware of the negligence of the defendant in providing the hammer and appreciated the dangers arising therefrom." Counsel for the defendant say that they insisted that this instruction should be modified so as to state "or by the exercise of ordinary care on his part could have known," etc., and "by the exercise of ordinary care would have appreciated the dangers arising therefrom." The court did not err in refusing to modify the instruction as re-

quested by counsel for the defendant; for the practical effect of the modification would have been to tell the jury that the plaintiff should have examined the hammer for. defects in it before he handed it to Blackman, the car repairer, for use; and this he was not required to do. In the case of *Little Rock, M. R. & T. Ry. Co.* v. *Leverett, Admr.,* 48 Ark. 333, the court said:

"A servant is not required to inspect the appliances of the business in which he is employed, to see whether or not there are latent defects that render their use more than ordinarily hazardous, but is only required to take notice of such defects or hazards as are obvious to the senses. The fact that he might have known of defects, or that he had the means and opportunity of knowing of them, will not preclude him from a recovery unless he did in fact know of them, or in the exercise of ordinary care ought to have known of them. He is not bound to make an examination to find defects. There is no such legal obligation imposed upon him. That is the duty of the master. The servant is not bound to search for dangers, except those risks that are patent to ordinary observation; he has a right to rely upon the judgment and discretion of his master, and that he will fully perform his duty towards him." (Citing cases.)

In the case of *Choctaw, Oklahoma & Gulf Railroad Company* v. *Jones,* 77 Ark. 367, the court said:

"In the application of the doctrine of assumption of risks a distinction must be also made between those cases where the injury is due to one of the ordinary risks of the service, and where it is due to some altered condition of the service, caused by the negligence of the master. The servant is presumed to know the ordinary risks. It is his duty to inform himself of them; and if he negligently fails to do so, he will still be held to have assumed them. The decision in the recent case of *Grayson-McLeod Company* v. *Carter,* 76 Ark. 69, rests on that ground as do many other cases found in the reports. But the servant is not presumed to know of risks and dangers caused by the negligence of the master, after he

enters the service, which changes the condition of the service. If he is injured by such negligence, he can not be said to have assumed the risk, in the absence of knowledge on his part that there was such a danger; for, as we have before stated, the doctrine of assumed risk rests on contract, but if the injury was caused in part by his own negligence, he may be guilty of contributory negligence. On the other hand, if he realizes the danger, and still elects to go ahead and expose himself to it, then, although he acts with the greatest care, he may, if injured, be held to have assumed the risk." (Citing cases.)

Again, in the case of *St. Louis, I. M. & S. Ry. Co.* v. *Birch,* 89 Ark. 424, the court said:

"The contention of learned counsel is that the above quoted instruction given at the instance of the plaintiff is erroneous, because it ignores the question of assumed risk. This instruction was predicated on the theory of negligence on the part of defendant in leaving the car door open so as to expose the switchman to danger. His right of recovery was made to depend entirely upon such negligence on the part of the defendant and the exercise of due care on his own part. He did not assume the risk of danger created by the negligent act of the employer unless he was aware of the danger and appreciated it. The fact that he could, by the exercise of ordinary care, have discovered and avoided the danger did not constitute an assumption of the risk where it arose by reason of negligence of the master, though he might have been guilty of contributory negligence, which would have prevented a recovery. *Choctaw, O. & G. Rd. Co.* v. *Jones,* 77 Ark. 367. In this respect the instruction given at the instance of the defendant was too favorable to it for the jury were therein told, in effect, that, notwithstanding the negligence of the defendant, if the plaintiff knew, or by the exercise of ordinary care and diligence could have known, of the condition of the car, how it was loaded and whether the door was open or not,' then he is deemed to have assumed the risk of the danger. This is not correct, as already stated."

Counsel for the defendant also contend that the court erred in refusing certain instructions requested by them. We need not set out the instructions; for they are open to the same vices as the modification to instruction numbered 2, requested by them, and in the application of the principles above announced, the court did not err in refusing them to the jury.

It is next insisted by counsel that the court erred in not directing a verdict for the defendant, but we are of the opinion that it was a question for the jury whether or not plaintiff assumed the risk of the defective condition of the hammer. The undisputed evidence shows that the hammer had an imperfect striking face and was in a defective condition, when considered with reference to the uses for which it was intended. Blackman, the car repairer, who struck the plaintiff, testified that he was accustomed to handling a sledge hammer and that he struck the turnbuckle properly as he intended to strike it; that if it had been a safe hammer, it would not have slipped and struck the plaintiff. That the hammer was caused to glance and strike the plaintiff because of the defective condition of its face. Hence, the jury was justified in finding from the evidence that the face of the hammer was defective and that its defective condition was the efficient cause of the injury to the plaintiff. Neither can we say, as a question of law, that under all the facts and circumstances adduced in evidence that an unskilled laborer of ordinary intelligence should have known that the hammer was defective and should have known and appreciated the dangers that he was exposed to by reason thereof. There is no hard and fast rule that may be laid down as governing the liability of an employer for a defect in common tools. In view of this condition, we do not undertake to say what state of facts the rule of liability should embrace and what state of facts it should not. We deem it sufficient to say that, while the question of liability of the defendant in the case at bar is an exceedingly close one, yet, under all

the circumstances adduced in evidence it was a question of fact for the jury and not one of law for the court. This is not a case where the servant was permitted to make his own selection of tools to be used by himself alone. On the other hand, a number of servants were engaged in the repair work in the yards at El Dorado. The tools were kept in a tool house and were furnished to the employees by a tool-keeper under the directions of the master. The tool house had been burned down some time prior to the injury to the plaintiff and there was a scarcity of tools, particularly of sledge hammers. Pending the arrival of the new supply the foreman had directed the car repairers when in need of tools not supplied to them to borrow them from the car repairer next to him. Plaintiff was assistant or helper of Blackman, a car repairer. They had been told to finish the car on which they were working by 12 o'clock, if possible. Blackman, being unable to loosen the turnbuckle on which they were working by pounding on it with an ordinary hammer, directed plaintiff to bring him a sledge hammer. Plaintiff went and got one and handed it to Blackman. They at once commenced working on the turnbuckle in the usual way to loosen it. The plaintiff was prizing towards himself with a lever and Blackman was opposite him, striking the turnbuckle with the hammer. After he had struck the turnbuckle three or four times it slipped and struck the plaintiff below the knee, causing the injury on account of which this suit was brought. Blackman says that he hit the turnbuckle where he intended to hit it and that the hammer glanced and struck the plaintiff because of the defective condition of its face. These are facts the jury were warranted in finding from the evidence. There was no duty imposed upon either plaintiff or Blackman to search for defects in the hammer. It can not be said, as a question of law, that the defect in the face of the hammer was so open and obvious that they could have seen the defect by a glance or by such casual observation as it would be natural for plain-

tiff to have made while carrying the hammer to Black-
man or by Blackman to have made after receiving it.

It is next insisted that the verdict is excessive.
Counsel cite the case of *Aluminum Company of North
America* v. *Ramsey,* 89 Ark. 522, where this court re-
duced a verdict from twenty thousand dollars to twelve
thousand, where plaintiff's leg was amputated; but we
do not think that case is authority for a reduction of the
verdict here. Each case must largely depend upon its
own circumstances. In the Ramsey case the plaintiff's
leg was amputated at once and there was no prolonged
and unusual suffering. Here an effort was made to save
the leg of plaintiff. A period of eleven months elapsed
from the time of his injury to the day of the trial. Dur-
ing all this time the plaintiff suffered great pain and was
confined to his bed for most of the time. He has been
unable to do any work since he received the injury and
constantly requires the attendance of a physician. One
of the physicians who examined him several months after
his injury was received says that he was under the influ-
ence of morphine. Presumably this was taken to alle-
viate his pain. At least the jury had a right to infer
that fact. All of the physicians who examined him agree
that if the bone is entirely involved his leg will yet have
to be amputated. Doctor Hilton, the physician who has
attended the plaintiff longest since his injury and who
has charge of the case, expressed the opinion that the
knee joint was involved and that, if such was the case,
amputation would be necessary. It is true that in one
part of his testimony he says that he does not know this
to be a fact, but when his entire testimony is considered
the jury were warranted in finding that, although Doctor
Hilton was treating plaintiff with the view to saving his
leg, yet his opinion was that amputation of the leg above
the knee joint would be necessary. And the jury were
warranted in finding from his testimony when considered
as a whole that this opinion was not based on conjecture
or supposition merely but was based on previous ex-
aminations of the leg made by laying it open to the bone

and on his treatment of the leg of the plaintiff after such examination was made.  Therefore, we can not say that the verdict was excessive.  See *Mo. & North Ark. Rd. Co. v. Collins,* 106 Ark. 353.

The plaintiff in his complaint alleged that he was a citizen, resident and inhabitant of Union County, Arkansas, and had been for two years prior to receiving the injury complained of and ever since, and that during all of that period of time he had been and still was a resident, citizen and inhabitant of the Texarkana Division of the Western District of Arkansas.  That Dallas County, Arkansas, the county in which suit was brought, is situated in the Western Division of the Eastern District of Arkansas.  The defendant in due form filed its petition and bond for removal of the cause to the Federal court, alleging that the amount involved exceeded, exclusive of interest and costs, the sum of three thousand dollars.  That the suit was of a civil nature, being an action for damages for a personal injury, and was between citizens and residents of different States in this, towit:  That at the time this action was commenced the plaintiff was a citizen and resident of the State of Arkansas and has been ever since and still is a resident and citizen of said State.  That the defendant was at the time this suit was commenced and still is a corporation organized and existing under the laws of the State of Illinois.  That at the time of the bringing of this action, long before and ever since the defendant has owned and operated a line of railroad through Dallas County, Arkansas, and also through numerous other counties in the Eastern District of Arkansas, and that during all of said time it had agents in Dallas County and other counties of said district upon whom summons could have been had.  The question at issue on this point has never been expressly decided by the Supreme Court of the United States, but it has been decided adversely to the defendant's contention in the case of *St. Louis & S. F. Rd. Co. v. Kitchen,* 98 Ark. 507, and the opinion in that case is controlling here.  There the court said:

"In determining whether a cause should be removed to the Federal court the State court may look to the allegations of the complaint, when not in conflict with the statements of the petition for removal.

"A suit brought in a State court outside of the Federal district in which the plaintiff resides is not removable on the ground of diversity of citizenship on petition of the defendant, who is a citizen and resident of another State."

Therefore, the judgment will be affirmed.

Mr. Justice WOOD thinks the verdict is excessive and that a remittitur of $5,000.00 should be entered. This amount is ample to compensate for the injury sustained. It is manifest from the amount of the verdict in this case that the jury allowed damages as for a permanent injury. According to the doctrine announced by this court in the recent case of *St. Louis, I. M. & S. Ry. Co.* v. *Bird,* 153 S. W. 104, 106 Ark. 177, there was no evidence to warrant this. The doctors themselves were uncertain as to whether the injury would be permanent. The jury should not be allowed to *speculate* concerning this.