The Producers Gravel & Sand Company, Inc., *v.* Jones.

(substituted appellee)

4-5390                    126 S. W. 2d. 99

Opinion delivered March 13, 1939.

*Ned-Stewart* and *Shaver, Shaver & Williams,* for appellant.

*Ward Martin, Sam T. & Tom Poe* and *C. E. Johnson,* for appellee.

Baker, J.   Although the record on this appeal is somewhat extensive, and the briefs are voluminous in addition to an elaboration by oral argument, the issues are few and clearly presented.

Three plaintiffs sued The Producers Gravel and Sand Company and the superintendent and manager of the company for damages arising out of injuries caused by a

truck, upon which they were riding, turning off, or leaving the highway and running into a ditch-bank, whereby serious injuries were sustained by each plaintiff. All the suits were consolidated for trial below and on appeal. The material allegations in each complaint were essentially alike except in the descriptions of the injuries sustained. Jim McCuller, who was the driver of the truck at the time of the accident, was named in the suits as a joint defendant with the others. Since the suits as to McCullers were dismissed and no issue is involved in such dismissal, all that part of the complaints in regard to McCuller will be disregarded.

It was alleged in the complaints that The Producers Gravel and Sand Company, a Louisiana corporation, owned and operated a gravel and sand pit three miles north of Wilton in Little River county.

Defendant Ross was alleged to have been in complete charge and control of the corporation and all its operations.

It was further alleged in the complaint that on March 10, 1937, and prior thereto, plaintiffs were employed by the defendant corporation as workmen at its gravel and sand pit near Wilton, on Little River; that in the early morning the defendant corporation furnished to the plaintiffs, and other workmen employed by it, an automobile truck to transport such workmen from Wilton, in Little River county, to the gravel and sand pit, and from the pit to Wilton at the end of each day's work; that this automobile truck was also used to haul and transport equipment and material in and about the gravel and sand pit.

It was further pleaded that it was the duty of the defendants to use ordinary care to furnish a reasonably safe automobile truck to transport plaintiff from Wilton to the gravel and sand pit on Little River and return, and to exercise ordinary care to keep the automobile truck in reasonably safe condition and repair.

In addition to these matters facts are stated showing that while driving at a speed of not exceeding twenty-five miles an hour, on return from the gravel and sand

pit to Wilton, the truck turned to the right, ran off the road into a ditch and into the bank on the far side of the ditch, causing the injuries complained of.

The answer filed was a general denial and a plea of assumption of risk. From verdicts in favor of each of the plaintiffs and consequent judgments this appeal comes. Appellants present only two issues. The first is, they argue that the testimony is insufficient to show or establish negligence. The second is that the plaintiffs assumed the risks. Our discussion of these propositions will, no doubt, tend to show that the distinction between the two issues, as set forth, is somewhat artificial. That is to say, neither one of the said issues, under the facts in this case, may be properly presented without a discussion to some extent, at least, of the other.

Many of the most essential and material facts are undisputed, but even as to these undisputed matters, counsel for the appellants and for the appellees arrive at wholly different conclusions. Contradictory announcements are found in regard to the same matters.

We shall attempt in some measure, at least, to state what we think are the undisputed facts.

The appellant for several years had been operating this gravel and sand pit on Little River, about three miles north of Wilton, having twenty or more employees who lived at Wilton and who went back and forth from their homes to the pit and from the pit to their homes. At least two of the plaintiffs testified that they had been so employed since 1930. In the early operation of this gravel and sand pit Mr. Ross operated an Essex car or automobile of which he was the driver and he picked up the employees in the mornings, took them to their place of work and returned with them in the afternoons after the day's work was completed. Later a truck was supplied which was used to haul the employees back and forth from their homes to the place of employment, or from the pit to their homes, some one of the employees acting as the driver. Finally the particular truck upon which the three plaintiffs were riding, at the time of the accident, was bought as a second-hand truck and sup-

plied or furnished and was constantly used for a year or two prior to the date of the wreck. This truck was used not only by the men employed at the gravel pit for this transportation, but on the grounds in and about the gravel pit when necessary to haul or move any particular bits or parts of machinery or other supplies. The truck had grown old, was somewhat delapidated and was an object of humorous ridicule by the men who rode back and forth upon it, and one of the plaintiffs in this case seemed to have been habitually accustomed to making humorous, and somewhat caustic remarks about the truck, its condition and appearance. On different occasions when some part would wear out or give away the company would supply new parts and would direct some one of the employees to make the necessary repairs. At least this seems to have happened two or three times when new universal joints were supplied and installed upon the truck. The company furnished necessary oil and gasoline for its operation. There is no evidence that Mr. Ross, the manager, or any other employee selected any particular one to drive the truck or control its operation. The evidence is ample, however, to show that the truck was generally driven by the employee of the defendant company who operated the hoisting machine at the gravel pit. We think the evidence also tends to show that the employees had some part in the selection of the driver as they complained and insisted among themselves that one driver who had perhaps driven faster than they thought was safe and he ceased in the rendition of that service to them, and at that time Jim McCuller, who was then operating the hoisting machine, assumed the position of driver of the truck and continued operating the truck until the date of the wreck. It is not contended that anybody rode upon this truck back and forth except employees of the defendant company, or that anybody drove it except one of those who was likewise employed, in going back and forth, as were the others upon these morning and afternoon trips. One or two witnesses testified directly that Mr. Ross told them to ride the truck back and forth, and several witnesses testified that on occasions when the time might be changed at which the

employees would go to work, Mr. Ross would personally see and notify different members of the crew so that they would be able to meet the truck and be picked up at the proper time to be carried to the place of employment. The appellants argue most seriously that there was no contract or agreement on their part to furnish or supply the truck; that they were under no legal duty or obligation, by reason of employment, to operate this truck, to carry or haul the employees back and forth, but that the furnishing of the truck was a mere license or a permission granted on the part of appellants to the employees to use the truck and that they accepted it in the condition in which they found it; that there was consequently no duty or obligation to maintain, inspect or repair the truck; that it was there so the men might use it as they did, when and how they chose, that no one controlled them in their use of the truck, directing them how to drive it, or otherwise, that its condition was apparent and that those who used it were charged with the knowledge of its condition and that consequently they assumed the risk.

A short time before this accident occurred, perhaps a few weeks or months, one of the employees had been sent by Mr. Ross to pick up and haul some boards with it and upon his return from the trip he had an accident, when it suddenly turned to the right and ran off the road, but without doing any particular damage or harm to him or the truck. He reported this accident to Mr. Ross, explained to him that the truck would not turn to the left by reason of some defect and that this occasioned this accident; that he and Mr. Ross both manipulated the truck so as to get it back on the road and that the condition of the truck at that time was explained to Mr. Ross to the effect that something was wrong with the steering mechanism which caused it to hang or stick and prevented its proper operation, causing the accident to happen.

Even though we should agree with appellants' contention that they were under no legal obligation to furnish or supply a truck upon which the employees could ride back and forth, we do not think it necessarily follows that since the appellants did undertake to furnish said truck

appellants owed no duty or obligation of inspection, repair or maintenance of the truck furnished. Nor do we think that because of the fact that neither the corporation nor Mr. Ross undertook to designate, select, or appoint anyone as the driver of the truck, while it was so used by the employees in going back and forth to their work, that fact makes any particular difference.

While the appellees' alleged negligence on behalf of the driver when they filed their suit, that part of the suit was dismissed and plaintiffs did not rely upon any negligence or misconduct of the driver of the truck at the time the accident and injuries complained of. They did rely upon the defective condition of the steering mechanism of the truck, which defect, under the undisputed evidence was known to Mr. Ross, who had sole managerial control of the plan and its operations. We do not mean that Mr. Ross thoroughly understood and comprehended every particular detail of this defective mechanism, but he knew that it had locked; that the truck had left the highway once before, because an employee could not turn the steering wheel. He knew whether it had been inspected and, if so, at what time and the results of such inspections, but there is no evidence that it had ever been inspected from and after the time it had been bought and furnished to the men and they began using it and the company began furnishing oil and gasoline for its use.

The evidence offered in this case by some of the witnesses, that Mr. Ross had directed them to ride the truck, that he had notified them on different occasions at what time the truck would go out, or that they would begin work, so that the men would know when to expect the truck, the fact that essential parts had been supplied for repairs necessary for its operation; that the company for years had furnished gasoline and oil, are evidentiary facts properly submitted to the jury to determine the implied contract or obligation on the part of the appellants to supply transportation. This question of implied contract or obligation to furnish transportation to the men so employed by the appellants was properly submitted to the jury and determined adversely to the con-

tention made by appellants. Certainly it may not be correctly said that fair-minded men might not differ as to the effect of these facts as determining the relation of employer and employee. The matter was, therefore, properly submitted to the jury.

The duty or obligation arising out of the conduct of the parties is, no doubt, as binding as if there were an express agreement to the same effect. It is argued, however, in this case that the employees were paid from the time they reached the plant, by the hour, until the hour at which they were ready to leave the plant. That is their pay was measured only by the number of hours in which they were actually engaged in work and did not include the time consumed by the men in going to and from the plant. While that fact is undisputed, it, in itself, does not determine that the operation of the truck was as much, if not more for the benefit of the employer than for the employees. Certainly the employer was interested in having the men go to work on time and to continue until the regulation quitting hour. There was no statute or rule, so far as we are advised, fixing or determining these matters. So it was a matter of contract, or obligation between the parties, fixed and determined by long continued custom and acquiescence, if not agreement.

These statements are made with reference more particularly to what is shown by the conduct of the parties than by the facts arising out of testimony showing, at least, some form of agreement or obligation, and the appellees are entitled to insist upon the most favorable statement of the issues in their favor to sustain the judgments rendered. We think it was not improperly urged that under the conditions permitting the employees to ride home from work and to ride from their homes back and to the place of employment, that the master owed a duty or obligation to exercise ordinary care to furnish reasonably safe transportation. This case is not one of first impression.

It was held in the case of *St. Louis-San Francisco Ry. Co.* v. *Barron,* 166 Ark. 641, 267 S. W. 582, that under a

custom permitting the employees to ride home from work, an employee riding home on the employer's engine was entitled to be treated as an employee rather than a bare licensee or trespasser. It was insisted in that case, as in the one at bar, that Barron was at most a bare licensee; that there was no duty or obligation owing to him by the railroad company and for that reason the evidence was not legally sufficient to sustain a verdict.

We think it might be said the identical questions were presented as a defense in that case, as have been urged upon this appeal, and the Supreme Court rejected that defense under the facts there stated. In that case the court said, among other things:

" . . . and we are therefore at liberty to look to the general principles of the law as announced by our own court in determining what the character of that relationship was. According to our decisions, appellee was, under the facts shown, neither a bare licensee nor a trespasser, but was an employee within the line of his duty in being transported from his place of work to his home."

The court there cited as applicable authority the following cases: *Arkadelphia Lbr. Co.* v. *Smith,* 78 Ark. 505, 95 S. W. 800; *St. L. I. M. & So. Ry. Co.* v. *Harmon,* 85 Ark. 503, 109 S. W. 295; *St. L. I. M. & So. Ry. Co.* v. *Wiggam,* 98 Ark. 259, 135 S. W. 889; *Chicago, R. I. & Pac. Ry. Co.* v. *Smith,* 115 Ark. 473, 172 S. W. 829; *Boyle-Farrell Land Co.* v. *Haynes,* 161 Ark. 183, 256 S. W. 43.

The court, in further discussing this very question, makes this statement in regard to the facts and the effect thereof:

"According to the evidence adduced, it was, at the time of appellee's injury and for a long time prior thereto, the general custom for employees to ride on the engines from their places of work to their homes. This was done by the direction of the superior agents of the company in charge at Muskogee. This custom became, impliedly, an element of the contract between the company and its servants at that place, and appellee was entitled to the privilege as a part of his contract."

The court also announced as an applicable rule the following: "Appellee at that time, pursuant to that custom, had the right, under his contract, to ride, and was entitled to the same protection as that afforded to a passenger."

This proposition, that is, the relation of the employer and employee and the duty and obligation of the employer to the employees, was a matter properly submitted to the jury and was determined by the jury adversely to the contention of the appellants, to the effect that there was, at least, the implied duty and obligation to exercise ordinary care to provide reasonably safe transportation.

The late Mr. Justice BATTLE announced with the approval of this court the following:

"While appellee was going home after his day's labor was done, he was still in the service of appellant. He was traveling in a hand car furnished by appellant, according to their implied contract; and the duties of the one to the other for the day, as master and servant, were not fully discharged. (Citing authorities) . . ." *Arkadelphia Lumber Co.* v. *Smith, supra.*

It was contended in that case, by the attorneys representing the appellant, that the hand car furnished the employees was furnished at their request and for their convenience before the employment had begun and after it had ended. That contention was decided by Mr. Justice BATTLE contrary to the contention made, and in support of the propositions appellees present here. This court made the same distinction that appellees insist upon under almost identical facts in the case of *Boyle-Farrell Land Co.* v. *Haynes, supra.* So we think it beyond dispute that since it has been determined and conclusively settled under the facts in this case that there was the implied obligation, at least, to transport these men to their places of employment, and home again after the day's work had ended, it was also a part of the employment, and there was a duty to exercise ordinary care to furnish safe transportation. This seems to be not only in accordance with our own decisions, but supported by the great weight of authority. 39 C. J. 272.

The notes and citations set out supporting the last citation are from different jurisdictions, including the Supreme Court of the United States, and proclaim this humane doctrine.

Appellants urge finally and most strongly that the appellees assumed the risks arising out of transportation upon this truck. While the argument made is forceful, it is unique in one respect and that is that the truck was old, so battered, so delapidated, so apparently unfit for use in the manner in which it was used that this court should hold, as a matter of law, that the appellees assumed the risks of riding thereon. In making this argument the appellants make the following statement:

"In the case at bar, appellees and other employees, with almost continuous regularity rode this old and notoriously dilapidated truck twice a day, covering a period of several years, and as a matter of law, they are charged with notice and knowledge of its condition by and through constant and almost daily observation and contact with it. The proof is undisputed that the truck was only used occasionally about the plant and transportation of material, and that no report was ever made to appellants of any defects in the truck or request made for any repairs or other or better means of conveyance, and the proof is not only undisputed, but is also conclusive that the appellees and other employees riding the truck had a far better opportunity to observe and had a superior knowledge of the condition of the truck than did the appellants."

Appellants cite many authorities to support their contention that the appellees assumed the risks. We have examined each of these authorities and must confess that while they have furnished interesting reading, we fail to see that they are applicable to the facts which are not substantially in dispute in this case. We have just quoted above what the appellants say about the truck, and most of the facts that they point out are matters of course, observable to any one who might have seen the truck, and the strongest conclusion that might be drawn from this statement is that because the truck was old and battered it should have been deemed unsafe. It is true

that if this accident had arisen out of, or by reason of any of these several matters mentioned as being so apparent and patent as to be readily observed by anyone, the argument would be considered in the light of the authorities presented, but the facts in this case are quite different. We have already stated facts showing that the steering mechanism of this car was unsafe, that Mr. Ross knew of this fact. Witnesses who examined the truck immediately after the accident say that one end of the draglink was disconnected. This draglink has been described as a part of the mechanism that connects the lower end of the steering shaft to the front wheels, so as to enable the driver to guide the machine. When the accident occurred one end of this draglink, as stated above, was loose. Some witnesses testify that it came off the truck and was found the next morning on the highway about thirty feet north of the point at which the car left the highway. It is undisputed, however, that this draglink was an essential part of the steering mechanism and without it being properly connected, the driver had no control over the truck or means of guiding it. It is undisputed that this steering mechanism was seriously defective. This fact was not only specially pleaded but positively established by the evidence. This draglink is down under the car, hidden and concealed from any casual or ordinary observation. Its defective condition could have been determined by any proper inspection and none was made in this case. Neither one of the three men injured had ever owned a car or truck, nor had ever driven one. Neither one knew what the draglink was or its importance in the operation of a car. The risk arising, therefore, out of the defective draglink was not an ordinary one, but so far as the evidence in this case discloses there was a concealed, rather than a patent defect, one easily discoverable, according to the evidence, by any ordinary inspection, one that Mr. Ross knew about, and, of course, under the facts and circumstances, his knowledge was information possessed by his company.

No duty rested upon the servant to inspect appliances furnished by the master. The relative duties and

obligations of master and servant are not unfamiliar to people generally. Those who may desire further discussion of these matters are cited to such well known authorities as *L. R. M. R. & T. Ry. Co.* v. *Leverett, Admr.*, 48 Ark. 333, 3 S. W. 50, 3 Am. St. Rep. 230; *Chicago, R. I. & Pac. Ry. Co.* v. *Smith*, 107 Ark. 512, 156 S. W. 166.

These citations are typical examples of numerous authorities with which our reports are replete.

The evidence tends to establish the positive negligence of the master and a lack of knowledge of that negligence on the part of the employees who were injured. The court, under such circumstances, could not properly declare as a matter of law that the servants had assumed these risks incident to their employment. The matter of assumption of risks was submitted to the jury under correct instructions and determined in favor of appellees.

Appellants argue error in instructions given, but as we have just stated the principal alleged error was that the court should have directed a verdict for appellants and not given any other instructions.

We have shown that appellants' contentions are not supported by the weight of authority, but are contrary or opposed to long established rules which must govern and control in situations of this kind. We have examined instructions given, those modified and given as modified, and those refused by the trial court, and we find no substantial error.

There is no contention that the judgments are disproportionate to the injuries and damages sustained.

The judgments are, therefore, affirmed.